OPINION
{¶ 1} This case is before us on an expedited appeal from a trial court decision granting permanent custody of the minor children, D.B., L.B., J.B., S.B., and D.F. to the Miami County Children Services Board (MCCS). The appeal is brought only by the natural mother, who shall be referred to as Denise. In support of her appeal, Denise raises the following assignments of error:
 {¶ 2} "I. The trial court erred in finding that permanent custody was supported by clear and convincing evidence and the grant of permanent custody was against the manifest weight of the evidence.
 {¶ 3} "II. The trial court erred in finding that the children cannot be placed with their mother within a reasonable time or should not be placed with their mother."
 {¶ 4} After carefully reviewing the record, we find the assignments of error without merit. Accordingly, the judgment of the trial court will be affirmed.
 I {¶ 5} MCCS initially became involved in this case in the summer of 2003, when Denise voluntarily approached MCCS to ask for respite care. At the time, Denise was the single parent of five children. The eldest, D.F., was an eleven year old male. The remaining children were J.B. (female, age seven); D.B. (male, age six); S.B. (female, age six); and L.B. (female, age five). Per Denise's request, MCCS placed the children in respite care for seven days. MCCS also worked with Denise under a voluntary case plan, which connected Denise with various services, including mental health care.
 {¶ 6} MCCS learned that Denise had previously been involved with community services in Auglaize County from 1997 to 2001. Auglaize County sent MCCS information regarding Denise's recent move to Miami County, the concern Auglaize County had for the welfare of the five children, and the lengthy history that Denise had in Auglaize County. After exhausting resources in Auglaize County, Denise chose to move to Miami County. She had also been hospitalized a number of times for mental health issues.
 {¶ 7} Denise has been diagnosed as having bipolar disorder, post-traumatic stress disorder, and generalized anxiety disorder. In addition, she has a borderline personality disorder and a dependent personality disorder. These disorders are chronic and severe, and have caused Denise to be hospitalized routinely. Due to her mental disorders, Denise is on SSI, and has limited financial resources.
 {¶ 8} The record further indicates that Denise has had a history of violent and abusive relationships. Larry B., the father of J.B., D.B., and S.B., was abusive, had been addicted to crack, and was also an alcoholic. At one point during their relationship (between 1995 and 1997), Denise stabbed Larry and was charged with felonious assault. After the assault, Denise was hospitalized for ten days in Clermont County for mental health concerns. She was later convicted of a fourth degree misdemeanor, and was placed on five years probation. Additionally, she was required to complete domestic violence counseling.
 {¶ 9} In 2002, Denise met a woman named Heather T. at the Crises Center, while both women were admitted at Dettmer Hospital. From that time on, Denise and Heather were involved in an on-again/off-again relationship. Like Denise, Heather had been diagnosed with bipolar disorder. Heather had mental health problems since she was 12, had been admitted to mental hospitals on several occasions, and had been in prison in 1990 for aggravated burglary. The relationship between Denise and Heather was very volatile and unstable, with violence occurring in front of the children — facts that both women consistently either minimized or were untruthful about. Among other things, Denise filed a police report in August, 2003, indicating that Heather had threatened Denise when her children were present. These threats included threats to kill Denise, and comments that Heather intended to get a gun and blow Denise's brains out.
 {¶ 10} As we mentioned, the voluntary contact with MCCS occurred prior to September, 2003. In September, or early October, 2003, Denise was admitted as an inpatient at Dettmer Hospital after a breakup with Heather. Denise had also been cutting on her arm. The children were aware when Denise cut herself, because she would have thirty to sixty lacerations up and down her arm. During this hospitalization, friends stayed with the children in the family home to keep the children from being put in foster care. After Denise was released, the friends continued to stay and helped with parenting. However, when they moved out of state in November, Denise was again admitted to Dettmer Hospital. This time, Denise voluntarily agreed to give temporary custody to family friends, and the children were placed in the friends' home. After about a week and a half, however, the friends asked MCCS to step in. The three girls were then placed in respite care, and the boys remained with the family friends for two to three more weeks. Because MCCS could not find a foster home close enough to let the boys stay in the same school, the boys were returned home to Denise, with MCCS retaining protective supervision. Denise agreed to give MCCS temporary custody of the girls, and they were placed in foster homes. Subsequently, on December 22, 2003, MCCS filed a complaint in Miami County Juvenile Court, alleging that the children were dependent under R.C. 2151.04(C).
 {¶ 11} On February 12, 2004, Denise filed an agreed entry admitting that the allegations in the complaint were true and that all five children were dependent. MCCS was then granted temporary custody of the girls and was given an order of protective supervision for the boys.
 {¶ 12} After Denise was released from the hospital in November, 2003, things progressed in a positive manner for a few months but then deteriorated. For short periods of time, Denise could do well, but then there would be a decompensation and her behavior patterns would change. Parenting would be an issue. When Denise cycled back up, MCCS would try to introduce the children again, and problems would reoccur. This type of cycle persisted throughout the case, despite large amounts of resources that were put in place. For example, Denise was assigned what is called an A.C.T. team because she was having problems with medications. The team went to Denise's home three times a day, unlocked a box where medicine was stored, and provided Denise with her medicine. She was also provided with individual therapy, home-based family therapy, and opportunities for in-home parenting classes.
 {¶ 13} A lot of the de-compensation had to do with relationship issues. Denise acknowledged that her relationship with Heather was not healthy. However, in February, 2004, Heather was again at Denise's home when MCCS caseworker, Jill Bradley, visited. Bradley told both Denise and Heather that Heather was not to have contact with the children. Bradley also discussed putting Heather on the case plan so that she could receive services. Although Denise and Heather initially agreed, Heather became very volatile toward Bradley a month later, when Bradley presented a case plan with the same conditions that had already been outlined. Heather later changed her mind again and signed an amended case plan that was filed with the court on April 7, 2004. Among other things, Heather agreed to a psychological evaluation, couples counseling, and restrictions on her presence in Denise's home. However, by their own admission, Denise and Heather failed to comply with the visitation restrictions. In fact, they were amused because they had fooled MCCS by parking Heather's car away from the premises.
 {¶ 14} Heather also failed to complete most of the other case plan requirements, because she and Denise broke up again in May or June, 2004. At that time, Heather and Denise both obtained civil protection orders against each other, that were supposed to last five years. Denise admitted to her caseworker at this point that being with Heather was harmful to the children, and that Heather had been verbally and emotionally abusive to Denise and the children. She also said Heather had been off her medication, had been drinking, and was acting bizarre. Later, in court, Denise would deny that Heather was a harmful influence.
 {¶ 15} In June and July, 2004, Denise was doing better, By the beginning of July, the children had all been returned home and MCCS had given custody back to Denise, while retaining protective supervision. However, things began to cycle downward again in August, 2004. In mid-August, Denise called the family in-home therapist (Mark Cooper) to ask that her eldest son, D.F., be placed in juvenile detention because of behavior problems. According to Cooper, D.F. was not having behavior problems. Instead, Denise wanted D.F. placed in detention because she was mad at him for telling his grandmother that Heather was back in the house. Neither Denise's mother nor her grandmother approved of the relationship with Heather.
 {¶ 16} The first opportunity Cooper had to visit the home was on Monday, August 23, 2004. When he arrived, he found the children riding their bicycles in the street. The house was basically in chaos, and Heather and Denise were on the couch, looking extremely drained. They were lethargic and out of it. School started the next day, and the girls had not been registered.
 {¶ 17} Around this time, Cooper had also received calls from the A.C.T. team and from foster parents, who were concerned about the children's welfare. Consequently, Cooper reported the concerns to MCCS and asked MCCS to check on the family. A letter was given to MCCS outlining the concerns. The letter, which is dated August 24, 2004, further says that: "It is the belief of the parties involved that allowing the children to stay in this environment is truly a detriment to them and there is a high probability the children are at risk of emotional abuse, neglect, and medical neglect." The letter was signed by Cooper, by the A.C.T. team, and by Cecelia Caldwell, who was Denise's individual therapist.
 {¶ 18} MCCS supervisor, Lori Rusnak, visited the house after school on Wednesday, August 25, 2004, because the regular caseworker (Jill Bradley) was out of town. At that time, Rusnak found out that the girls had still not been in school. To get in the front door, Rusnak had to make a path to get to the couch so that she could sit down. During the visit, Heather came in the house and unloaded groceries. Rusnak expressed the concerns that had been voiced throughout to Denise and Heather about their relationship. Rusnak stressed that if the women were going to be together, the case plan would have to be amended. However, Denise and Heather said they would not abide by any restrictions. They also told Rusnak that they had not abided by the prior plan they had signed. Moreover, Denise said she had taken the children off their medications. She had not discussed this with the doctor, but had done that on her own. According to Rusnak, Denise was flat, and was sitting there totally blank, almost like a zombie.
 {¶ 19} When Denise's caseworker, Bradley, got back in town, she had a phone message from the school on Thursday, June 26, 2004, reporting that the children were still not enrolled. Eventually, the girls were enrolled on Friday, August 27, 2004. Bradley visited the home that day, and found the home chaotic, with open cans of food, trash piled up in the kitchen, mattresses on the floor with no linens, empty cans and dirty dishes in the bedrooms, a dresser on its side, boxes piled everywhere, individual pills out where the children could access the medication, etc.
 {¶ 20} Due to these problems, MCCS scheduled a family stability meeting for Monday, August 30, 2004. At the meeting, MCCS discussed the concerns from the previous week, and Denise did not recall most of the events that had occurred, even including visits with her that had lasted for more than an hour. Denise claimed she had been ill, but she had not visited a doctor or emergency room even though several people, including caseworkers, had urged her to do so.
 {¶ 21} MCCS scheduled a follow-up meeting, which was held on September 2, 2004. At that time, MCCS again offered Heather services and tried to put her on the case plan. However, Heather became volatile and threw papers at Rusnak, hitting Rusnak in the face. Heather was escorted off the premises by a deputy and was eventually charged with menacing, for which she spent thirty days in jail. The only difference from prior case plans was the addition of a chemical dependency evaluation, because Heather had recently been hospitalized at Dettmer, to detoxify from heroin and marijuana.
 {¶ 22} Rusnak described the meeting in which the violence occurred, as follows:
 {¶ 23} "[B]ased on Heather's behavior in front of us, as adults, * * * and the reaction that everybody had in that room, * * * some people wanted to hide under the table, because of the fear at how quickly she can escalate and what she can display, Um, and imagining being a child of the age, at that time six to eleven, * * * imagining the fear they must live through every day, we came back with a proposal that Heather was not to be found in the home in any fashion. Um, whether the kids are at home or whether they were at school, no. If you're going to continue this relationship, then these are perimeters (sic) that need to be put in place. Um, Denise absolutely would not see. No, not doin' it. Very adamantly would not do that."
 {¶ 24} Accordingly, MCCS filed for an ex parte order and removed the children from Denise's care that day. MCCS also prepared and filed a motion asking for permanent custody of the children. Nonetheless, MCCS still attempted to work with Heather and to involve her in a case plan, later in September, 2004. However, after first indicating that she was willing to work on a plan, Heather disagreed. She then broke up with Denise in front of everyone and left the MCCS facility. Denise was very distraught, and MCCS was concerned for her stability at that point. Denise agreed to leave the children with MCCS and checked herself again into Dettmer Hospital.
 {¶ 25} A hearing on permanent custody was held in March, 2005. At that time, Denise and Heather were again living together, after having reconciled in December, 2004. As we mentioned, both women minimized or denied violence in their relationship or around the children. Heather claimed she had never threatened Denise in front of the children, and had never mistreated or emotionally abused the children. Denise also testified that she did not agree with the agency's concern that Heather was a danger to her children. According to Denise, she continued to have a relationship with Heather, knowing it affected having her children in her home, because she believed MCCS based its opinion on isolated incidents and had never given Heather a chance.
 {¶ 26} Events that took place on January 13, 2005, cast doubt on this testimony. After the children were removed in September, 2004, and the motion for permanent custody was filed, Denise was allowed supervised visitation every other week, for two hours. On January 13, 2005, Denise missed the regularly scheduled visitation. The children all arrived at 6:00 p.m., as scheduled, but Denise still had not arrived by 7:00 p.m. The children became very anxious. The youngest child, L.B. (who was six years old), began crying, and said "I know why my mom's not here. It's because Heather's raped my mom." The other children also became very upset, and D.B. stated, "My mom is probably dead. And Heather probably killed my mom." The eldest son, D.F., was completely broken down and was weeping. Shortly thereafter, the supervisor for foster homes and adoption (Cathy Cornell) arranged for the children to be picked up by their foster parents. Cornell then drove to Denise's house. When Cornell arrived, it was about 9:00 p.m., and both Heather and Denise were there. Cornell asked why Denise had not come for the visit, and Denise said she had completely forgotten. Denise said she had a lot of "crap" going on and felt terrible about missing the visit.
 {¶ 27} Denise had a further hospital admission in February, 2005, and Heather was in Dettmer Hospital at the time of the custody hearing in March, 2005. On April 27, 2005, the trial court denied the motion for permanent custody, based on the fact that proper service of summons had not been made. The court continued the order of temporary custody, and indicated that the order would expire on September 2, 2005, unless a motion for modification, extension, or termination were filed by August 18, 2005.
 {¶ 28} Subsequently, on June 3, 2005, MCCS filed another motion for permanent custody. After taking further evidence in July, 2005, the trial court issued an extensive and very thorough decision on August 11, 2005. At the time of the final hearing, Denise and Heather had once again broken up, and Denise was living by herself in an efficiency apartment. On an April 7, 2005 supervised visit with the children, Denise became overwhelmed with several of the children who were acting out. She broke down crying and could not continue on. At that point, the eldest son, D.F., began taking over and parenting the other children. D.F. reported that his mother was upset because she and Heather had broken up. Denise was also arrested for driving under suspension in May, 2005, and her car was impounded. And finally, Denise began domestic violence counseling only shortly before the final hearing, even though it had been part of her requirements stemming from an evaluation she had with a psychologist in January and February, 2005.
 {¶ 29} After reviewing the evidence, the trial court granted permanent custody of all five children to MCCS, finding that the MCCS had made reasonable efforts to return the children to their mother's home. The court also found that the order of permanent custody was in the best interests of the children. Regarding D.F. and D.B. (the boys), the court further found that they could not be placed with their mother within a reasonable time or should not be placed with their mother.
 {¶ 30} On appeal, Denise contends that the decision granting permanent custody was not supported by clear and convincing evidence and was against the manifest weight of the evidence. In particular, Denise contends that a grant of permanent custody was not in the best interest of the children based on the factors listed in R.C. 2151.414(D)(1)-(5). We disagree.
 {¶ 31} We will not reverse a trial court decision about "`parental rights and child custody unless the determination is not supported by sufficient evidence to meet the clear and convincing standard of proof.' "* * *" `Clear and convincing evidence is that level of proof which would cause the trier of fact to develop a firm belief or conviction as to the facts sought to be proven.'" Miller v. Greene Cty. Children's Serv.Bd., 162 Ohio App.3d 416, 420, 2005-Ohio-4035, 833 N.E.2d 805, at ¶ 31 (citations omitted). Under R.C. 2151.414(D), the trial court is required to determine the best interests of the child, by considering:
 {¶ 32} "all relevant factors, including, but not limited to, the following:
 {¶ 33} "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 {¶ 34} "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 {¶ 35} "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 {¶ 36} "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 {¶ 37} "(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child."
 {¶ 38} The trial court extensively considered these factors as they related to the children. There was no dispute about the fact that the children cared for their mother and were bonded to each other. However, the caseworkers and counselors who had been dealing with the effects of the instability and cycle of events on the children concluded the children's need for stability and permanency outweighed their attachment to their mother. They felt that the children's stability would be at risk if they were placed back into an environment that was violent, chaotic, unstable, and disruptive, with little or no chance of success. As the trial court noted in discussing the reasons why an order of permanent custody was in the best interest of the two sons:
 {¶ 39} "Denise * * * has chronic mental illness that is so severe that it makes her unable to provide an adequate permanent home for her children at the present time, and as anticipated, within one year, due to her eight year history and repeating cycle. Further, she demonstrated a lack of commitment to her sons by choosing abusive, violent relationships with husbands/boyfriends/partners without recognizing the effect of these relationships on her children, her unwillingness to adequately attend to her own mental health issues and her inability or unwillingness to recognize the needs for structure, supervision, safety, security and consistency. This lack of commitment is demonstrated by an eight year cycle that Denise * * * has been unable or unwilling to provide financially for her children by inviting others into her home which was already crowded, that her relationships with others was abusive and violent in front of the children, that she was noncompliant with her medications resulting in frequent and numerous hospitalizations and her lack of attention to the needs of her children to be in a stable, safe, secure, structured, consistent environment with appropriate attention and supervision."
 {¶ 40} These comments are true as well of Denise's relationship with her daughters, who had been in foster care for fifteen to sixteen months at the time the motion for permanent custody was filed. We will not repeat the extensive findings that the trial court made about the children's welfare, treatment, and progress since they were placed in foster care. We do note that the court's findings are amply supported by the record, which we have reviewed in detail. While in their mother's care, the children suffered significant emotional trauma resulting from their unstable and chaotic environment. They were doing well in the stable environments of their foster care homes. Besides the violence and other problems outlined above, the children's therapy while in foster care revealed potential sexual abuse between siblings and by one of Denise's ex-husbands. In contrast, while in foster homes, the children were well-supervised, were making up academic deficits, and were receiving the therapy and medication they needed.
 {¶ 41} Denise points to the fact that the children were generally well-mannered and the fact that they accepted guidance from each other as evidence that she must have done something right. However, the issue is not whether the natural mother has done something or anything right; it is whether the evidence indicates that an order of permanent custody is in the best interests of the children.
 {¶ 42} Denise also relies on the fact that her son, D.F., expressed a desire to live with her. While this is one of many factors under R.C. 2151.414(D), it is not controlling. Furthermore, D.F. was the eldest son, and had taken on a parental role in the home, attempting to do what his mother could not. The evidence indicated that this role of being a "parentified child" is harmful and was very stressful for D.F.
 {¶ 43} Because the trial court decision was supported by clear and convincing evidence and was not against the manifest weight of the evidence, the first assignment of error is without merit and is overruled.
 II {¶ 44} In the second assignment of error, Denise contends that the trial court erred in finding that her sons, D.F. and D.B., cannot be placed with her within a reasonable amount of time or should not be placed with her due to chronic mental illness. This finding was required, because unlike the girls, the boys had not been out of the home for twelve of twenty-two consecutive months at the time the motion for permanent custody was filed. Consequently, the court had to find that the boys could not be placed with Denise within a reasonable time or should not be placed with Denise. See R.C. 2151.414(B)(1)(a), and R.C. 2151.414(E)(2).
 {¶ 45} As we mentioned earlier, the trial court found that Denise could not provide an adequate home due to chronic, severe mental illness, an eight year history and repeating cycle of problems, a lack of commitment to the boys through her choice of abusive, violent relationships, a lack of commitment to her children through unwillingness to attend to her own mental health issues, noncompliance with medications, resulting in frequent hospitalizations, etc. Denise claims these findings were erroneous, based on evidence in the record from a psychologist (Dr. Higgins) that Denise had an understanding of parenting skills as well as a strong bond with her children. Denise also points to the fact that she did comply with her medication from February, 2005, to July, 2005, and the fact that she continued to attend counseling with her therapist through the time of the final custody hearing.
 {¶ 46} Our previous discussion disposes of these arguments, because we agreed with the trial court that awarding MCCS permanent custody is in the best interests of the children. As is apparent from that discussion, no one disputed that Denise could function reasonably well on a short-term basis, like she apparently did between her most recent hospitalization in February, 2005, and the last hearing in July, 2005. However, the record also shows a documented and lengthy history of such cycles in which short-term progress was followed by a downward spiral of chaos, poor parenting judgments, mental health hospitalizations, and an inability to adequately care for the children. Consequently, the trial court correctly concluded that D.F. and D.B. could not be placed with Denise within a reasonable time or should not be placed with Denise. Accordingly, the second assignment of error is also without merit and is overruled.
 {¶ 47} In view of the preceding discussion, both assignments of error are overruled and the judgment of the trial court is affirmed.
Wolff, J., and Grady, J., concur.