[Cite as *In re M.W.*, 2020-Ohio-5199.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

In the Matter of:            :

       M.W.,                :           No. 19AP-769
                                         (C.P.C. No. 16JU-650)
                                :

[L.W.,                              (REGULAR CALENDAR)

                                :
       Appellant.]

                                :

---

D E C I S I O N

Rendered on November 5, 2020

---

**On brief**: *Steven Thomas D. Potts*, for appellee Franklin County Children Services.

**On brief**: *Yeura R. Venters*, Public Defender, and *George M. Schumann*, for appellant.

---

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

BROWN, J.

{¶ 1} Appellant, L.W. ("mother"), appeals from a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, granting the motion of appellee, Franklin County Children Services ("FCCS" or "agency"), for permanent custody of mother's child, M.W. For the reasons which follow, we affirm.

{¶ 2} M.W. was born November 30, 2006. FCCS filed a complaint on January 15, 2016, under case No. 16JU-650, alleging M.W. was a dependent child. M.W. was already in the temporary custody of FCCS at the time FCCS filed the January 15, 2016 complaint pursuant to an order issued in case No. 15JU-12748.

{¶ 3} FCCS obtained temporary custody of M.W. in case No. 15JU-12748 following an October 17, 2015 incident where mother left M.W. in the care of mother's adult daughter, Ma.W. During the October 17, 2015 incident, M.W. grabbed a knife, ran out of her older sister's house, and asked neighbors to contact police. Ma.W. informed officers that she could not handle M.W. and that she was unable to contact mother. FCCS took custody of M.W. and placed her in a foster home. At the foster home, M.W. climbed a 30-foot cable tower and threatened to jump off. When an officer tried to rescue her she tried to push the officer off the tower. Following the cable tower incident, FCCS placed M.W. at Belmont Pines, a residential treatment facility located in Youngstown, Ohio. FCCS filed case No. 16JU-650 as case No. 15JU-12748 was about to expire by operation of law.

{¶ 4} On March 24, 2016, the trial court adjudicated M.W. dependent, ordered temporary custody to FCCS, and adopted a case plan. The case plan required mother to complete alcohol and other drug ("AOD") assessment and follow any recommendations, participate in regular drug screens, participate in parenting classes, cooperate with a parent mentor, participate in family counseling with M.W., keep in regular contact with M.W., maintain stable housing, and meet M.W.'s basic, medical, and educational needs. M.W. was discharged from Belmont Pines in May 2016 and placed in a foster home in Lithopolis, Ohio.

{¶ 5} On October 18, 2016, the trial court granted FCCS an extension of the temporary custody order. On April 14, 2017, the trial court granted FCCS a second and final extension of the temporary custody order. FCCS filed a motion for permanent custody on September 11, 2017.

{¶ 6} In September 2017, FCCS placed M.W. in a foster home located in Pickerington, Ohio. M.W. was taken to the hospital in October 2017 after she reported feeling upset and suicidal. M.W. was released from the hospital to a respite foster home, and eventually returned to the Pickerington foster home.

{¶ 7} Throughout the first year and one-half of the case, mother failed to maintain stable housing. However, in August 2017 mother began renting an apartment located on East 26th Avenue in Columbus, Ohio. M.W. began having overnight visits with mother in the home. In a March 7, 2018 report, the guardian ad litem ("GAL") recommended

returning M.W. to mother's custody under FCCS protective supervision, as mother had maintained stable housing for several months.

{¶ 8} In June 2018, FCCS opened a case concerning M.W.'s brother, R.W., born March 2, 2005. R.W.'s agency case commenced following a June 8, 2018 incident where mother left R.W. in the care of Ma.W., R.W. obtained Ma.W.'s gun, and began pointing the gun "at himself and threatening to pull the trigger, stating suicidal intentions." (Nov. 15, 2018 Semiannual Adm. Review ("SAR") at 4.) The gun incident was ultimately unsubstantiated, and R.W. continued to reside with mother under a temporary order of protective supervision. R.W.'s case plan required mother and R.W. to complete mental health assessments and referred R.W. to counseling services.

{¶ 9} In October 2018, mother lost her housing on East 26th Avenue and mother and R.W. began living in a homeless shelter. On October 10, 2018, FCCS removed M.W. from her Pickerington foster home and placed M.W. at Buckeye Ranch, a residential treatment facility located in Columbus. At Buckeye Ranch, M.W. was diagnosed with Post-Traumatic Stress Disorder unspecified and Attention Deficit Hyperactivity Disorder combined type; M.W. also demonstrated depressive symptoms. M.W. takes six different medications to address her conditions.

{¶ 10} On January 7, 2019, the GAL filed a report recommending the court grant FCCS's motion for permanent custody as mother failed to engage in mental health services or maintain stable housing. As M.W. clearly expressed her wish to return to her mother, the court appointed an attorney to represent M.W.

{¶ 11} A two-day trial on the motion for permanent custody commenced on October 3, 2019. Mother appeared at the trial and testified. The court also heard testimony from the FCCS caseworker, M.W.'s clinician at Buckeye Ranch, and the GAL. The court interviewed M.W. on the record in the presence of the GAL and M.W.'s attorney. On October 9, 2019, the trial court issued a decision and judgment entry granting FCCS's motion for permanent custody and divesting mother of her parental rights.

{¶ 12} Mother appeals the judgment of the trial court, presenting the following assignment of error for our review:

> The juvenile court's judgment granting permanent court commitment of the minor child to Franklin County Children Services is against the manifest weight of the evidence.

{¶ 13} Parents have a constitutionally protected fundamental interest in the care, custody, and management of their children. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *In re Murray*, 52 Ohio St.3d 155, 157 (1990). These rights, however, are not absolute, and a parent's natural rights are always subject to the ultimate welfare of the child. *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979). Thus, in certain circumstances, the state may terminate the parental rights of natural parents when it is in the best interest of the child. *In re E.G.*, 10th Dist. No. 07AP-26, 2007-Ohio-3658, ¶ 8, citing *In re Harmon*, 4th Dist. No. 00 CA 2694 (Sept. 25, 2000).

{¶ 14} R.C. 2151.414 governs the termination of parental rights in Ohio. *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, ¶ 42. Pursuant to R.C. 2151.414(B)(1), a trial court may grant permanent custody of a child to an agency if the court determines, by clear and convincing evidence, that: (1) it is in the best interest of the child to grant permanent custody of the child to the agency, and (2) one of the situations set forth in R.C. 2151.414(B)(1)(a) through (e) applies. Clear and convincing evidence is more than a mere preponderance of the evidence; it concerns that "measure or degree of proof which 'will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.' " *K.H.* at ¶ 42, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 15} A trial court's determination in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re Andy-Jones*, 10th Dist. No. 03AP-1167, 2004-Ohio-3312, ¶ 28. "Judgments are not against the manifest weight of the evidence when all material elements are supported by competent, credible evidence." *In re J.T.*, 10th Dist. No. 11AP-1056, 2012-Ohio-2818, ¶ 8. Accordingly, "[p]ermanent custody judgments which are supported by some competent, credible evidence going to all essential elements of a case will not be reversed as being against the manifest weight of the evidence." *In re A.L.*, 10th Dist. No. 15AP-1040, 2016-Ohio-3189, ¶ 18, citing *In re Brofford*, 83 Ohio App.3d 869, 876-77 (10th Dist.1992).

{¶ 16} "[I]n determining whether a judgment is against the manifest weight of the evidence, the reviewing court is guided by the presumption that the findings of the trial court are correct." *In re R.L.*, 10th Dist. No. 07AP-36, 2007-Ohio-3553, ¶ 8, citing *Brofford*. Thus, "[i]n reviewing a judgment granting permanent custody to FCCS, an appellate court

'must make every reasonable presumption in favor of the judgment and the trial court's findings of facts.' " *J.T.* at ¶ 8, quoting *In re P.G.,* 10th Dist. No. 11AP-574, 2012-Ohio-469, ¶ 37. " '[I]f the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the [juvenile] court's verdict and judgment.' " *In re Brooks,* 10th Dist. No. 04AP-164, 2004-Ohio-3887, ¶ 59, quoting *Karches v. Cincinnati*, 38 Ohio St.3d 12, 19 (1988).

{¶ 17} The trial court found clear and convincing evidence established the circumstance described in R.C. 2151.414(B)(1)(d). R.C. 2151.414(B)(1)(d) describes the situation where the child "has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period." Mother does not dispute the trial court's conclusion that M.W. was in the temporary custody of FCCS for more than 12 months out of a consecutive 22-month period.

{¶ 18} Once the trial court determines that one of the circumstances in R.C. 2151.414(B)(1) applies, the court must then determine whether a grant of permanent custody is in the best interest of the child. R.C. 2151.414(B)(1). R.C. 2151.414(D)(1) provides that, in determining the best interest of the child, the court must consider all relevant factors, including but not limited to, the following: (a) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child, (b) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child, (c) the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period, (d) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency, and (e) whether any of the factors in divisions (E)(7) to (11) of R.C. 2151.414 apply in relation to the parents and child.

{¶ 19} The trial court reviewed the R.C. 2151.414(D)(1) best interest factors and found clear and convincing evidence demonstrated granting FCCS's request for permanent

custody was in M.W.'s best interest. Mother contests the trial court's findings under the best interest factors.

{¶ 20} Mother initially asserts the evidence concerning the R.C. 2151.414(D)(1)(a) best interest factor, regarding M.W.'s interactions and interrelationships with significant people in her life, weighed against granting FCCS permanent custody. The trial court found that mother and M.W. were "deeply bonded," and that their interactions were appropriate. (Decision at 9.) The court noted that both the FCCS caseworker and the GAL testified to the bond between mother and M.W. The evidence supported these findings.

{¶ 21} However, "resolution of [R.C. 2151.414(D)(1)(a)] is not limited to merely the bond between child and parent." *In re K.R.*, 10th Dist. No. 18AP-633, 2019-Ohio-2192, ¶ 81. "Courts have considered the consistency of a party's visitation with a child when resolving the R.C. 2151.414(D)(1)(a) factor." *Id.* at ¶ 82, citing *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 59. The trial court noted that, although mother testified she visited M.W. consistently, the FCCS caseworker believed mother's visits were "fewer than they could have been, especially with the very open policy at Buckeye Ranch where [M.W.] ha[d] been living for almost a year." (Decision at 9.)

{¶ 22} The Buckeye Ranch allowed visitations every day, from 2:30 to 8:30 p.m. on weekdays and from 9:00 a.m. to 8:00 p.m. on weekends. The Buckeye Ranch clinician testified that mother had visited M.W. "between one and four times a month" throughout the year M.W. lived at Buckeye Ranch. (Oct. 4, 2019 Tr. at 49.) A May 13, 2019 administrative review of the case noted that, while mother had been visiting M.W. at Buckeye Ranch consistently, mother "recently declined the taxi that was sent to her to get to visits, and since that time, her visits have declined." (May 13, 2019 SAR at 3.) The review stated that mother "visiting inconsistently" caused M.W. "to be anxious and worried." (May 13, 2019 SAR at 3.) The court also noted that mother occasionally brought too many people to visits, resulting in less interaction time between mother and M.W. The record supported the trial court's observation. (Oct. 3, 2019 Tr. at 134-35.)

{¶ 23} Mother asserts the trial court failed to discuss the emotional harm M.W. would experience as a result of having her relationships with her mother and brother severed. However, as the trial court specifically addressed the deep bond between mother and M.W., the trial court would have weighed the emotional harm of severing that bond in

assessing M.W.'s best interest. The trial court noted that mother and M.W. discussed R.W. during their visits, and that M.W. told the court she "misse[d] her brother and would like to live with him and help him with his homework." (Decision at 9-10.) Thus, the trial court also weighed M.W. and R.W.'s relationship in arriving at its determination. The court found no other evidence of significant relationships in M.W.'s life.

{¶ 24} Thus, in analyzing the evidence relevant to the R.C. 2151.414(D)(1)(a) best interest factor, the court recognized the significant relationship between mother and M.W., and M.W.'s relationship with R.W., but also noted mother's less than frequent visits with M.W. at Buckeye Ranch. Mother's somewhat inconsistent visits at Buckeye Ranch allowed the court to weigh the R.C. 2151.414(D)(1)(a) factor slightly in favor of granting FCCS permanent custody.

{¶ 25} Mother asserts the evidence pertinent to the R.C. 2151.414(D)(1)(b) best interest factor, concerning the wishes of the child, weighed against granting FCCS permanent custody. The trial court noted that M.W. "clearly expressed her wish to return to mother" during the in camera interview. (Decision at 10.) The court also noted that, contrary to M.W.'s wishes, the GAL recommended granting the motion for permanent custody.

{¶ 26} Mother contends that M.W.'s wishes under the R.C. 2151.414(D)(1)(b) factor should weigh heavier against permanent custody, due to M.W.'s age and bond with mother. R.C. 2151.414(D)(1), however, does not give any one factor "greater weight than the others." *Schaefer* at ¶ 56. Rather, the statute "requires a weighing of all relevant factors." *Id.* at ¶ 64. *See In re D.B.*, 2d Dist. No. 2005-CA-33, 2006-Ohio-479, ¶ 42 (noting that "[w]hile [the wishes of the child] is one of many factors under R.C. 2151.414(D), it is not controlling"). Thus, the trial court could not give M.W.'s wishes under the R.C. 2151.414(D)(1)(b) factor greater weight than the other best interest factors.

{¶ 27} Furthermore, the court had to consider M.W.'s stated wishes in light of the GAL's recommendation. The GAL was appointed to the case shortly after the initial filing. The GAL acknowledged that mother and M.W. were "very bonded," but indicated that mother had a "long history of one step forward, two steps backwards." (Oct. 4, 2019 Tr. at 56.) The GAL explained that mother "demonstrate[d] a very poor ability to put into practice whatever she learns from parenting classes and to have an appropriate level of parenting

supervision." (Oct. 4, 2019 Tr. at 57.) The GAL noted that mother only kept things together for "about eight months" and did not "seem to go beyond that." (Oct. 4, 2019 Tr. at 60.) As such, the GAL characterized M.W.'s wish to return to her mother's custody as "unrealistic." (Oct. 4, 2019 Tr. at 58.)

{¶ 28} The court appropriately weighed M.W.'s expressed wish to return to her mother and the GAL's contrary recommendation in the court's analysis of the R.C. 2151.414(D)(1)(b) best interest factor. The GAL's recommendation permitted the court to weigh the R.C. 2151.414(D)(1)(b) factor somewhat in favor of granting FCCS permanent custody. *See In re J.W.*, 10th Dist. No. 19AP-122, 2019-Ohio-4775, ¶ 29 (stating that, where the wish of the child conflicted with the GAL's recommendation to grant the motion for permanent custody, the R.C. 2151.414(D)(1)(b) factor "nonetheless weigh[ed] at least somewhat in favor of the trial court granting permanent custody to FCCS").

{¶ 29} Mother contends that the R.C. 2151.414(D)(1)(c) best interest factor, concerning the custodial history of the child, did not weigh in favor of granting FCCS permanent custody. In addressing the R.C. 2151.414(D)(1)(c) factor, the court noted only that M.W. had been in the temporary custody of FCCS for more than 12 months out of a consecutive 22-month period. Mother does not dispute the length of time M.W. was in the temporary custody of FCCS; rather, mother asserts that the "12-out-of-22 circumstance" should not necessarily weigh in favor of permanent custody, as the 12-out-of-22 circumstance "triggers the statutory best-interest analysis" under R.C. 2151.414(B)(1). (Appellant's Brief at 47.)

{¶ 30} However, as any of the R.C. 2151.414(B)(1)(a) through (e) factors may trigger the best interest analysis, the 12-out-of-22 circumstance described in R.C. 2151.414(B)(1)(d) will not always be the triggering event. Moreover, while R.C. 2151.414(B)(1)(d) addresses only the 12-out-of-22 circumstance, R.C. 2151.414(D)(1)(c) permits a court to review the broader custodial history of the child. *See In re S.H.*, 12th Dist. No. CA2020-02-023, 2020-Ohio-3499, ¶ 33 (noting the "plain language of R.C. 2151.414(D)(1)(c) instructs the court to consider, generally, the custodial history of the child"); *In re Ca.T.*, 8th Dist. No. 108969, 2020-Ohio-579, ¶ 35. While the trial court may consider additional facts beyond the 12-out-of-22 circumstance in its analysis under R.C. 2151.414(D)(1)(c), the court is under no obligation to do so. *In re T.M.*, 10th Dist. No. 18AP-

943, 2020-Ohio-815, ¶ 19 (rejecting the contention that a trial court must take other facts beyond the 12-out-of-22 finding into consideration when considering custodial history under R.C. 2151.414(D)(1)(c)).

{¶ 31} In the present case, however, M.W.'s entire custodial history weighs in favor of granting FCCS permanent custody. FCCS first gained temporary custody of M.W. in 2009, when M.W. was three years old. The 2009 case opened after mother was publicly intoxicated and walking in a busy street with her children. Although M.W. returned to mother's care in 2010, the 2009 case did not close until October 2013. M.W.'s custodial history in the present case began only two years later, in October 2015, and M.W. has remained in FCCS custody since that time.

{¶ 32} Mother contends the time M.W. spent in FCCS temporary custody should not weigh against her, as FCCS sought extensions of temporary custody for reasons not related to mother. However, FCCS's first and second motions for extensions of temporary custody stated the extensions were necessary because M.W. needed additional time to complete treatment and because mother needed additional time to complete case plan objectives. At the time the court granted both the first and second extensions of temporary custody, mother had yet to maintain stable housing in the case. Accordingly, mother's need to complete her case plan objectives, including acquiring stable housing, also contributed to the greater than 12-month time period M.W. spent in FCCS temporary custody.

{¶ 33} Thus, the record demonstrates the trial court made the 12-out-of-22 finding, and that M.W.'s more detailed custodial history weighed in favor of granting the motion for permanent custody. Accordingly, the R.C. 2151.414(D)(1)(c) best interest factor weighed in favor of granting FCCS permanent custody.

{¶ 34} Mother asserts the evidence relevant to the R.C. 2151.414(D)(1)(d) best interest factor, concerning the child's need for legally secure placement and whether such placement can be achieved without a grant of permanent custody, weighed against granting FCCS permanent custody. "Without doubt, every child needs a legally-secure placement." *E.G.* at ¶ 26. The trial court noted M.W. was in great need of legally secure placement and that such placement could not be achieved without granting permanent custody to the agency. The trial court found M.W.'s father had abandoned her, and there were no relatives who were suitable alternative placements.

{¶ 35} The court noted M.W.'s diagnoses and the behavioral issues she demonstrated throughout the case. The court observed M.W. had made significant progress while living at Buckeye Ranch and that she was ready to be discharged "into a family setting with continued outpatient counseling and medication services." (Decision at 12.) FCCS placed M.W. at Buckeye Ranch due to incidents of suicidal threats, running away from placement, and physical aggression toward others. At Buckeye Ranch, M.W. participated in weekly individual therapy, daily group counseling, and took her prescribed medications. After a year of treatment M.W. had demonstrated "a sharp decrease in suicidal threats," reduced "incidents of AWOL or out of bounds," "decreased incidents of physical aggression," and an improved ability to express emotions. (Oct. 4, 2019 Tr. at 50.) M.W. was also excelling academically at Buckeye Ranch.

{¶ 36} The court addressed mother's two other children, Ma.W. and R.W. The court observed Ma.W. was removed from mother's custody and placed in the legal custody of an aunt in 2009, and that mother "pled guilty to Domestic Violence of [Ma.W.] in 2010." (Decision at 13.) The court noted R.W. attempted suicide in March 2017, was suspended for bringing a knife to school in September 2018, assaulted a teacher in May 2019, and was charged with receiving stolen property in September 2019. At the time of trial, FCCS had custody of R.W., but R.W. had recently "AWOLed from [the] agency" and his whereabouts were unknown. (Oct. 4, 2019 Tr. at 10, 13.) R.W. left agency custody during a September 2019 incident where the FCCS caseworker left mother and R.W. alone in the lobby of the FCCS building.

{¶ 37} The court observed mother had completed some objectives of her case plan, as mother completed AOD assessment and treatment, completed parenting classes shortly before trial, had worked with a parent mentor, and visited M.W. throughout the case "even if considered not as often as she could." (Decision at 14.) The court noted mother had social security income and worked a temporary employment job. The court observed that, although mother only participated in two family counseling sessions with M.W. at Buckeye Ranch, mother had participated in family counseling sessions at other times throughout the case. The court addressed the fact that mother was being considered for reunification in 2018, but noted that mother then "began a downhill slide" and made "extremely poor

choices which included leaving a stable apartment, becoming homeless for a period." (Decision at 14.)

{¶ 38} At the time of trial, mother had been living in her own independent housing since February 2019. Mother asserts that, as she had housing at the time of trial, she was able to provide for M.W.'s basic needs. The caseworker testified to the difficulties she encountered trying to visit with mother in her current residence, as mother frequently was not at the home and there was a "two-month span where [mother] did not have a working phone." (Oct. 3, 2019 Tr. at 150-51.) However, after being able to visit the home, the caseworker did not have any safety concerns about the home.

{¶ 39} Although mother maintained housing for several months prior to trial, mother had not maintained permanent and stable housing throughout the life of the case. Mother stated she lived in three residences on her own, in no more than five homes of friends or family members, and in a homeless shelter throughout the case. (Oct. 3, 2019 Tr. at 74-76.) Mother maintained stable housing for several months between 2017 and 2018, but lost housing in 2018 and became homeless for "about five months." (Oct. 4, 2019 Tr. at 77.)

{¶ 40} "[A] court is not limited to considering only current compliance with case plan objectives related to housing and income in its analysis of the child's need for a legally secure, permanent placement." *K.R.* at ¶ 87, citing *R.L.* at ¶ 15-17. *See In re K.Z.*, 4th Dist. No. 19CA22, 2020-Ohio-1013, ¶ 76 (observing that "[e]ven if at times the parents lived in a stable home, they were unable to maintain a stable home throughout the case"); *T.M.* at ¶ 25 (holding that all the "positive actions" mother took with respect to her case plan were "in vain given her inability to provide a safe and stable home for the children"). Mother's inability to maintain housing throughout the case demonstrated that mother could not provide M.W. with stable housing.

{¶ 41} Mother asserts the trial court unduly faulted her for choosing to leave the East 26th Avenue apartment and become homeless, as the "evidence described a constructive eviction situation." (Appellant's Brief at 50.) Mother affirmed she was evicted from the East 26th Avenue apartment, explaining that she "did not want to pay [the landlord] after he wouldn't fix anything up, so [she] took the money and moved." (Oct. 3, 2019 Tr. at 73-74.) Mother indicated that in her mind the maintenance issues rendered the apartment

uninhabitable. Mother also affirmed she was aware of the Franklin County Municipal Court's rent escrow program, which permits tenants to place their rent in escrow until a dispute regarding housing is resolved. Mother stated she did not utilize this county program because "when [she] went to court, they just said if I had moved that I would not have an eviction on my record, so I moved." (Oct. 4, 2019 Tr. at 69.) Mother also stated that she "basically wanted to leave [the apartment] anyway." (Oct. 4, 2019 Tr. at 79.) However, mother admitted she did not have plans for a new living arrangement when she left the East 26th Avenue apartment and that she became homeless as a result. (Oct. 4, 2019 Tr. at 80.)

{¶ 42} " '[T]he weight to be given the evidence and the credibility of the witnesses are primarily questions to be answered by the trier of fact.' " *T.M.* at ¶ 10, quoting *Sparre v. Ohio Dept. of Transp.*, 10th Dist. No. 12AP-381, 2013-Ohio-4153, ¶ 12. "The rationale for this deference is the trier of fact is in the best position to view witnesses and observe their demeanor, voice inflections, and gestures." *Id.*, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). The trial court was in the best position to judge the credibility of mother's contention that maintenance issues in the East 26th Avenue apartment forced mother to become homeless. Evidence in the record supported the trial court's conclusion that mother made choices which resulted in her becoming homeless including that mother failed to make alternative living arrangements before leaving the apartment and failed to utilize a county program which could have helped remedy the maintenance issues in the apartment.

{¶ 43} The trial court observed that, although mother claimed to have "money in the bank," mother admitted she was behind on a utility bill and that she had no working phone in her residence. (Decision at 15.) The court also noted that mother had "no transportation to take [M.W.] for appointments." (Decision at 15.) Although mother contends she had sufficient income to support herself and M.W., mother affirmed that throughout the case she asked the agency for financial assistance to buy furniture, a washer and dryer, pay her rent, and for transportation. (Oct. 3, 2019 Tr. at 81.) Mother asserts that she would utilize public transportation to take M.W. to appointments. However, the record indicated that when the agency did not provide mother with transportation, mother would miss visitations. Mother testified she missed drug screens when she did not have "a bus pass to

get down there." (Oct. 3, 2019 Tr. at 58.) Accordingly, the record supported the court's concerns regarding mother's income and lack of transportation.

{¶ 44} Mother asserts the trial court unnecessarily faulted her for failing to engage in additional family counseling sessions at Buckeye Ranch. Although mother contends there were no issues between her and M.W. which necessitated family counseling, participating in family counseling was a component of mother's case plan. The trial court observed mother had "not facilitated family counseling to help herself deal with her special needs child's homecoming." (Decision at 15.) Thus, the court appropriately considered mother's decision to not participate in family counseling as a detriment to mother's ability to care for M.W.

{¶ 45} Mother participated in two family counseling sessions during the year M.W. was at Buckeye Ranch, one in August 2019 and the other immediately prior to trial in October 2019.   The FCCS caseworker explained mother was supposed to "at least participate in family counseling once or twice a month" at Buckeye Ranch. (Oct. 3, 2019 Tr. at 145.)  Mother stated she had been "waiting on the [Buckeye Ranch] clinician to give [her] a call" to schedule family counseling, but she "hadn't heard from her." (Oct. 3, 2019 Tr. at 95-96.) Mother did not reach out to Buckeye Ranch to try to schedule family counseling sessions. The Buckeye Ranch clinician testified she tried to contact mother to schedule family counseling, but that "phone service was an issue." (Oct. 4, 2019 Tr. at 50.) From February to May 2019, Buckeye Ranch attempted to contact mother to schedule family counseling, but mother's "contact information continue[d] to not be valid" throughout that time. (May 13, 2019 SAR at 2.) Notably, the FCCS caseworker informed mother that participating in two consecutive family counseling sessions was a prerequisite to allowing M.W. to have visits in mother's home. Yet, mother did not participate in sufficient family counseling sessions to permit home visits throughout 2019.

{¶ 46} Mother told the court she would follow through with getting M.W. the mental health treatment she needed if M.W. returned to her care. The trial court, however, observed that mother had "no plans for continued counseling, school placement, or outpatient psychiatric and medical care for her daughter if she [was] returned home." (Decision at 15.) The court also noted mother could not "name any of the prescriptions her child needs to stabilize her behavior." (Decision at 15.) The court observed mother made

"poor choices" with respect to R.W., including mother's choices for R.W.'s "care while she was away from home, failing to get [R.W.] mental health assistance and taking his suicidal ideations as attention seeking behavior, failing to supervise him and allowing him to AWOL from Children Services." (Decision at 14-15.) The court concluded that returning M.W. to mother "now or in the near future would most certainly lead only to the deterioration of the great progress [M.W.] has made." (Decision at 15.)

{¶ 47} Mother asserts the trial court "moved the goal post" in the present case, as the court terminated mother's parental rights of M.W. based on evidence concerning R.W. (Appellant's Brief at 54.) Mother contends she was not responsible for R.W.'s bad behavior, and that R.W.'s behavior did not preclude mother from meeting M.W.'s needs. Although the trial court did not base its permanent custody decision solely on evidence concerning R.W. as mother appears to contend, mother's parenting choices with respect to R.W. were a relevant factor for the court to consider in its assessment of mother's ability to care for M.W.'s needs.

{¶ 48} "[N]othing prohibits a court from basing a permanent custody decision upon a parent's past history with a children services agency. In fact, courts have recognized that a parent's past history is one of the best predicators of future behavior." *In re West*, 4th Dist. No. 05CA4, 2005-Ohio-2977, ¶ 28. Thus, a parent's "past parenting history and her ability to comply with prior reunification plans regarding her other children [are] relevant considerations in the juvenile court's dispositional determination to commit [mother's current child] to the permanent custody of the Department." *In re Brown*, 60 Ohio App.3d 136, 139 (1st Dist.1989). *See In re Vaughn*, 4th Dist. No. 00CA692 (Dec. 6, 2000) (noting that "[t]o further the interests of the children, the court must consider any evidence available to it, including a parent's pattern of conduct," as "[s]ome of the most reliable evidence for the court to consider is the past history of the children and the parents"); *In re J.B.*, 6th Dist. No. S-14-005, 2015-Ohio-460, ¶ 96 (holding that "[i]nformation about the family's history with children services," including testimony about "past referrals regarding the family which were unrelated to this case," were "relevant and admissible in a permanent custody action"); *In re T.W.*, 10th Dist. No. 10AP-897, 2011-Ohio-903, ¶ 28 (holding that appellant's "failure to complete case plan objectives with respect to T.W.1, T.W.2, T.J., and

N.H. [was] clearly relevant to the determination of whether appellant ha[d] remedied the problems that caused [her youngest child] C.H.'s removal").

{¶ 49} The June 8, 2018 gun incident which brought R.W. under agency supervision occurred after mother left R.W. in Ma.W.'s care. The October 17, 2015 incident which resulted in M.W.'s removal from mother's care also occurred after mother left M.W. in Ma.W.'s care. The GAL testified that part of mother's problem with parental supervision was that, when mother "delegates parental supervision, she chooses bad people such as her adult daughter and that's part of that two steps backwards." (Oct. 4, 2019 Tr. at 56.) Mother's failure to supervise R.W. and her continued delegation of parental responsibilities to Ma.W. demonstrated that mother had not remedied the problems that caused M.W.'s removal from her custody in the present case.

{¶ 50} Moreover, the record indicated mother continued to use Ma.W. to supervise M.W. during the case. M.W. spent five days at mother's residence during M.W.'s 2018 spring break. During those five days "[i]t was reported that [mother] was not there from Sunday to Tuesday. [M.W.] was at the home with her adult sister due to [mother] working." (Apr. 30, 2018 SAR at 4.) At trial, however, mother denied ever allowing Ma.W. to supervise M.W. during a home visit. During the five days M.W. spent at mother's home in spring 2018, M.W. "missed taking her medication while at the visits" and M.W.'s foster mother described M.W. as "all off track" when she returned to the foster home. (Apr. 30, 2018 SAR at 4.)

{¶ 51} Mother explained she did not provide R.W. with counseling services after his March 2017 suicide attempt because mother "felt that he was actually doing it for attention" and "that he didn't need" counseling. (Oct. 3, 2019 Tr. at 66.) Following the June 8, 2018 gun incident, the agency referred R.W. to The Village Network for counseling services and ordered that R.W. receive a mental health assessment. Mother admitted at trial that she "had to make appointments to get to the point that -- to get [R.W.] into counseling," and stated that it "probably took a month" for her to set up the counseling appointment for R.W. (Oct. 4, 2019 Tr. at 93-94.) The caseworker investigated mother's claim that she had "called someone back" about scheduling a counseling appointment for R.W., and discovered that mother "had not" made any call to schedule R.W. for counseling. (Oct. 4, 2019 Tr. at 39-

40.) The caseworker stated that mother did not follow through with setting R.W. up with counseling or a mental health assessment.

{¶ 52} Mother explained that she viewed M.W. differently than R.W. because "they diagnosed her with stuff, as my son they didn't." (Oct. 4, 2019 Tr. at 76.) Although mother testified that she believed M.W. was getting help with "depression" at Buckeye Ranch, mother could not name any of M.W.'s other diagnoses and could not name any of the medications M.W. was taking. (Oct. 3, 2019 Tr. at 98-99.)

{¶ 53} The FCCS caseworker stated that, if M.W. were returned to mother, the agency would "make a referral to an aftercare service" but mother "would have to follow up with that provider in calling them back, setting up an appointment." (Oct. 4, 2019 Tr. at 36.) The caseworker testified that based on mother's "history of not following through with providers, calling them back, responding to them reaching out to her," the caseworker was concerned M.W. would "not get her aftercare services that she needs" if M.W. returned to mother's care. (Oct. 3, 2019 Tr. at 142.) The GAL stated that he did not believe "mother could adequately parent and supervise [M.W.]," as mother's issues with R.W. indicated that mother would not "be able to meet [M.W.'s] higher special needs." (Oct. 4, 2019 Tr. at 57-58.)

{¶ 54} The record demonstrated that M.W. being medication compliant and in consistent therapy had resulted in a decline in M.W.'s suicidal and inappropriate behaviors. M.W.'s need to continue her mental health treatment was a relevant factor for the court to consider in its assessment of M.W.'s best interest. *See T.W.* at ¶ 47 (stating the trial court "considered 'other relevant factors' including each of the children's individual treatment needs"). Mother's choice to not provide R.W. with mental health treatment following a suicide attempt, mother's belief that R.W.'s suicide attempt was attention seeking behavior, and mother's failure to set R.W. up with counseling or a mental health assessment after FCCS referred those services were relevant to the court's assessment of the credibility of mother's contention that she would provide M.W. with mental health treatment. M.W.'s behaviors throughout the case demonstrated that she needed consistent parental supervision, but the record indicated mother continued to fail to supervise R.W. and that mother failed to properly supervise M.W. during an extended visit in spring 2018.

{¶ 55} Thus, the trial court did not simply consider R.W.'s bad behavior in isolation, but properly considered mother's parenting choices in response to R.W.'s behaviors and needs as indicators of the parenting choices mother would make with respect to M.W. Competent and credible evidence in the record supported the court's conclusion that mother could not provide M.W. with legally secure and permanent placement. Indeed, in addition to mother's parenting choices for R.W., the record demonstrated that mother was unable to maintain stable housing throughout the case, failed to participate in sufficient family counseling sessions at Buckeye Ranch, was not familiar with M.W.'s diagnoses and medications, did not appear to have sufficient income to support M.W., and lacked transportation to take M.W. to appointments. The GAL and the FCCS caseworker testified that mother could not adequately supervise M.W. or care for M.W.'s needs.

{¶ 56} Although mother asserts M.W.'s numerous placement changes while in FCCS custody fail to demonstrate stability, the record demonstrates M.W.'s placement changes were due in large part to M.W.'s problematic behavioral issues, and that M.W. had recently made great progress on those issues through her treatment at Buckeye Ranch. Accordingly, the record supports the court's conclusion that returning M.W. to mother's care would detract from M.W.'s great progress and would fail to provide M.W. with the stability she needs. *See In re J.L.M.*, 12th Dist. No. CA2015-11-206, 2016-Ohio-2773, ¶ 35 (holding that, where mother asserted that the juvenile court " 'minimized' the fact that [the children's] current foster home [was] their third placement," in light of mother's "inability to attain and maintain stable housing and a stable source of income, granting Mother custody of the children would not add to the children's security and stability, but instead, detract from it immeasurably"). The R.C. 2151.414(D)(1)(d) best interest factor weighed in favor of granting FCCS permanent custody.

{¶ 57} Mother contends the trial court's best interest analysis was against the manifest weight of the evidence because mother had substantially completed her case plan at the time of trial. However, "R.C. 2151.414(D) does not require courts to deny a children services agency's motion for permanent custody solely by virtue of a parent's substantial compliance with the case plan," as substantial compliance with a case plan is "but one of many factors the court may find relevant * * * in rendering its judgment." *In re Brooks* at ¶ 62-63. "Thus, while evidence of case plan compliance is relevant to a best-interest

determination, it is not dispositive of it." *T.W.* at ¶ 55. *Accord T.M.* at ¶ 31; *In re Conn*, 10th Dist. No. 03AP-348, 2003-Ohio-5344, ¶ 19. The trial court concluded that, while mother had completed several portions of her case plan at trial, mother also demonstrated that she could only "intermittently achieve" the goals stated in her case plan before "return[ing] to her previous habits and choices." (Decision at 15.)

{¶ 58} Mother lastly contends that, as the trial court did not find any of the R.C. 2151.414(E)(7) through (11) factors applicable to mother, the R.C. 2151.414(D)(1)(e) best interest factor weighed against granting permanent custody to FCCS. Mother asserts that the absence of the R.C. 2151.414(E)(7) through (11) factors demonstrates mother was not chronically unfit or abusive to children in the past. However, " 'R.C. 2151.414 does not require that a trial court find a parent unfit before it may terminate that parent's parental rights.' " *In re P.S.*, 10th Dist. No. 08AP-1023, 2009-Ohio-1545, ¶ 17, quoting *In re W.A.*, 10th Dist. No. 06AP-485, 2006-Ohio-5750, ¶ 18. In a case in which R.C. 2151.414(B)(1)(d) applies, the trial court is only required to find that the termination of parental rights is in the best interest of the children. *Id.* at ¶ 17. The trial court properly weighed the absence of the R.C. 2151.414(E)(7) through (11) factors against the other relevant best interest factors which were present in the case. *See In re L.C.G.*, 7th Dist. No. 16 MA 0039, 2016-Ohio-8217, ¶ 34-35, 58.

{¶ 59} Upon a thorough consideration of the record, we find clear and convincing evidence exists to support the trial court's determination that an award of permanent custody was in M.W.'s best interest. As such, the trial court's decision granting permanent custody to FCCS was not against the manifest weight of the evidence. Mother's sole assignment of error is overruled.

{¶ 60} Having overruled mother's sole assignment of error, the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, is affirmed.

*Judgment affirmed.*

SADLER, P.J., and LUPER SCHUSTER, J., concur.

———————————————