[Cite as *In re B.D.*, 2023-Ohio-224.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| IN RE B.D. | : | |
| | : | No. 111767 |
| A Minor Child | : | |
| [Appeal by Father] | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** January 26, 2023

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD 20902707

### *Appearances:*

Scott J. Friedman, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Rachel Matgouranis, Assistant Prosecuting Attorney, *for appellee*.

MICHAEL JOHN RYAN, J.:

{¶ 1} The underlying case involves the termination of the parental rights of the mother and fathers of two children, B.D., who was born in 2012, and C.L., who was

born in 2020. Mother has filed an appeal in a companion case, *In re C.L.*, 8th Dist. Cuyahoga No. 111667. The within appeal was taken by the father ("Father") of B.D. After a thorough review of the facts relevant to Father and B.D., as well as the pertinent law, we affirm.[1]

**Factual and Procedural History**

{¶ 2} B.D. was born in 2012. In February 2020, the Cuyahoga County Division of Children and Family Services ("CCDCFS" or "agency") filed a complaint alleging that B.D. and C.L. were neglected and requesting a disposition of temporary custody to the agency. The agency also filed a motion for emergency temporary custody of the children. Father was named in the complaint as B.D.'s "alleged father" because paternity had not yet been established.

{¶ 3} At the time of the filing, the children were in the legal custody of a relative, which was the result of an adjudication from prior cases, Cuyahoga J.C. Nos. AD17914599 and AD17915500. The relative was no longer willing to provide care for the children, Mother had not addressed the concerns that led to the children's removal, and B.D.'s Father had failed to establish paternity, support, visit, or communicate with B.D. since birth.

{¶ 4} The juvenile court held a hearing in March 2020. Father failed to appear at the hearing. After the hearing, the children were placed in the predispositional emergency temporary custody of CCDCFS.

---

[1] We only discuss Mother and C.L. as is necessary and find it unnecessary to discuss C.L.'s father.

**{¶ 5}** In July 2020, a magistrate held an adjudication and disposition hearing. Father failed to appear. The children were adjudicated dependent and committed to the agency's temporary custody.

**{¶ 6}** In January 2021, CCDCFS filed a motion to modify temporary custody to permanent custody. A trial was set for January 12, 2022, a year after the motion was filed. Father made his first appearance in the case on the day of trial. The court appointed counsel for him and rescheduled trial for February 4, 2022.

**{¶ 7}** On February 1, 2022, Father's counsel filed a motion for continuance so that Father could have more time to establish a relationship with B.D. and complete his case plan objectives. The trial court granted the motion.

**{¶ 8}** The trial went forward on May 25 and 26, 2022. Father appeared with counsel the first day, and counsel asked for a continuance so that Father could have more visitation with B.D. The trial court denied the request. The court noted that Father had been receiving notices of the case proceedings since the inception of the case in February 2020, but did not make his first appearance until January 2022. The court further noted that the case had already been continued to allow Father more time to develop a relationship with B.D.

**{¶ 9}** Father failed to appear for the second day of trial, and his counsel requested a continuance. The trial court questioned counsel regarding Father's absence. Counsel responded that he had not heard from Father and he did not "know what the issue" was. The trial court denied the request.

**Trial Testimony**

**B.D.'s Behavioral and Mental Health Issues and Needs**

{¶ 10} An intervention specialist at B.D.'s school testified that the child had behavioral issues. The specialist began working with B.D. in late 2021, with the goal of helping B.D. to cope when she was upset, angry, or overwhelmed so that she could keep herself and others safe.

{¶ 11} The intervention specialist testified that B.D. was making strides but, in early 2022, B.D. was "[j]ust angry and mad" and would fight, argue, and act in a destructive manner. Initially, B.D. would exhibit this behavior once or twice a week, but it later escalated to a near-daily occurrence. As a result of the behaviors, B.D. was suspended from school numerous times. The intervention specialist did not believe that B.D. had met any of the goals of the intervention plan.

{¶ 12} B.D.'s foster mother testified that she has continuously fostered both B.D. and her sibling for more than two years. According to the foster mother, B.D. has been diagnosed with post-traumatic stress disorder, attention deficit hyperactivity disorder, bipolar disorder, schizophrenia, and a mood disorder. B.D. had behavioral issues when she first came to live with the foster mother, and they worsened over time. The foster mother testified that in the six weeks prior to the trial, she called the police to her home approximately six times due to concerns about B.D.'s behavior, which included "tying things around her neck," "banging her head on the floor," and "threatening to kill herself." B.D. had been prescribed medication and, at the time of trial, was compliant with taking it.

{¶ 13} Similar to B.D.'s intervention specialist, the foster mother testified about B.D.'s escalating behavioral issues. The foster mother testified that B.D.'s behaviors started escalating in December 2021. The child had suicidal ideation, increased aggression, frequent meltdowns, was hearing voices, and had an inability to express her feelings. From January 2022 through the May 2022 trial date, B.D. had been hospitalized approximately eight times due to mental health crises. According to the foster mother, B.D. cannot be left alone.

{¶ 14} The CCDCFS caseworker assigned to the case corroborated the intervention specialist and foster mother's testimonies. The caseworker testified that B.D.'s aggression became more severe and she was "acting out" against younger students at school.

{¶ 15} At the time of trial, B.D. was nine years old. She had been adjudicated abused, neglected, or dependent on four separate occasions (including this case) and had been in the continuous custody of the agency for over two years.

**Father's Case Plan**

{¶ 16} Father was initially designated as "alleged father" because his paternity had not been established at the time this complaint was filed. A case plan was developed for Father. The plan consisted of Father establishing paternity, establishing a relationship with B.D., demonstrating an understanding of the child's behavioral issues, and securing appropriate housing.

{¶ 17} Father's paternity was established in December 2021. Despite being named as "alleged father" in the February 2020 complaint, Father did not attempt

to establish a relationship with B.D. until after paternity was confirmed. When CCDCFS initially attempted to engage Father, he stated that he did not want any involvement with CCDCFS or B.D. until his paternity was confirmed.

{¶ 18} The caseworker testified that Father did not appear to understand B.D.'s behavioral and mental health issues. She described Father as not having "much response" and appearing "confused" when she attempted to discuss the child's behaviors and needs with him. According to the caseworker, Father was not consistent in trying to visit with B.D. She also testified that Father never reached out to her to discuss B.D.'s issues and needs and he was not consistent with learning about her needs and finding out how he could assist B.D. in managing her behaviors and issues.

{¶ 19} In regard to the housing component of Father's case plan, the caseworker testified that Father was residing in a one-bedroom apartment with his two-year old grandson. The caseworker had concerns about Father's housing situation because of B.D.'s behavioral issues and her tendency to act aggressively toward younger children. The worker was also concerned that, because the apartment had only one bedroom, there would not be space to separate B.D. and the two-year grandson if need be.

{¶ 20} Father told the caseworker that his mother passed away and he and his siblings inherited her home. However, Father admitted that the house had not been maintained and was uninhabitable. Father told the caseworker that if he

gained custody of B.D. and had not secured larger housing, he would sleep on the couch and B.D. and the grandson would share the bedroom.

{¶ 21} The agency referred Father to the Community Collaborative to assist him in obtaining appropriate housing. As of the time of trial, Father had not secured new housing.

{¶ 22} Father began having telephonic contact with B.D. around January 2022 and maintained that contact through the time of trial in May 2022. Father would call B.D. in the morning before school. However, as of the time of trial, Father had only a few — "maybe three" as testified to by the foster mother — in-person visits with B.D.

{¶ 23} The agency also had concern about granting custody of B.D. to Father because, at the time of trial, Father had a pending criminal case for felonious assault with firearm specifications, which was alleged to have been committed in December 2021.

**B.D.'s Foster Placement**

{¶ 24} As of the time of trial, B.D. and her sibling had been placed together with the foster mother for over two years. They had a schedule at the foster mother's house and were comfortable with her. The children were also "happy to be together."

{¶ 25} B.D.'s basic needs were being met in her foster placement. She was receiving counseling and psychiatric services and was up to date with her medical appointments.

**B.D.'s Placement Wish**

{¶ 26}        B.D. was not consistent about her wish as to her placement. The foster mother testified that B.D.'s wish changes depending "on who she's mad at and how she feels." At various times, B.D. stated that she wanted to live with the foster mother, Mother, or Father.

**Guardian Ad Litem's ("GAL") Report**

{¶ 27}        The GAL recommended that legal custody of B.D. be granted to Father. According to the GAL, Father "only had about six months to work on a relationship with B.D." The GAL admitted, however, that although he had been the GAL on the case since March 2020, his first contact with Father was a few weeks prior to the May 2022 trial. The GAL also admitted that the Father's proposed living arrangement in his one-bedroom apartment was not ideal. He further admitted that Father's pending criminal case could pose an obstacle to him working on his relationship with B.D.

**Other Pertinent Facts**

{¶ 28}        Father told the caseworker that he "doesn't want to be rushed into this. He doesn't want to be put on a set timeframe." In contrast, the CCDCFS caseworker testified that permanent custody is in B.D.'s best interest because "this is [B.D.'s] [fourth] time in custody. No case plan services have been met, and [B.D.] just need[s] permanency."

**Juvenile Court's Findings**

{¶ 29}　　　In granting CCDCFS's motion for permanent custody, the juvenile court made numerous findings including (1) B.D. cannot be placed with either parent within a reasonable time or should not be placed with her parents; (2) Father does not fully understand the needs of B.D.; (3) prior to the dispositional hearing, no relative or other interested person has filed, or has been identified in, a motion for legal custody; (4) Father has demonstrated a lack of commitment toward B.D. by failing to regularly support, visit, or communicate with B.D. when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child; (5) Father abandoned B.D.; and (6) that it was in the best interest of B.D. to be placed in the permanent custody of CCDCFS.

**Assignments of Error**

I.　　The juvenile court abused its discretion when it denied Father's motion for a continuance.

II.　　The juvenile court erred in terminating the Appellant's parental rights, in violation of his rights under the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution.

**Law and Analysis**

**No Abuse of Discretion in Denying Motion to Continue**

{¶ 30}　　　On the first day of trial, Father requested a continuance so that he could have more visitation with B.D.  The trial court denied the request.  On the second day of trial, Father failed to appear and his counsel requested a continuance.  The trial court questioned counsel regarding Father's absence; counsel responded

that he had not heard from Father and he did not "know what the issue" was. The trial court denied the request.

{¶ 31} In his first assignment of error, Father contends that the trial court abused its discretion in denying a continuance because "he had limited opportunities in a short period of time" to become involved in B.D.'s life.

{¶ 32} The decision to grant or deny a motion for a continuance rests within the broad discretion of the trial court. *State v. Froman*, 162 Ohio St.3d 435, 2020-Ohio-4523, 165 N.E.3d 1198, ¶ 91, citing *State v. Unger*, 67 Ohio St.2d 65, 67, 423 N.E.2d 1078 (1981), syllabus. This broad discretion is also afforded to the trial court in a permanent custody hearing. *In re A.W.*, 8th Dist. Cuyahoga No. 109239, 2020-Ohio-3373, ¶ 25.

{¶ 33} """There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.""" *Id.* at ¶ 26, quoting *Unger* at *id.*, quoting *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S. Ct. 841, 11 L.Ed.2d 921 (1964). Factors to consider include

> "the length of the delay requested; whether other continuances have been requested and received; the inconvenience to litigants, witnesses, opposing counsel and the court; whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which gives rise to the request for a continuance; and other relevant factors, depending on the unique facts of each case."

*In re A.W.* at ¶ 26, quoting *Unger* at 67-68.

{¶ 34} Additionally, Juv.R. 23 provides that "[c]ontinuances shall be granted only when imperative to secure fair treatment for the parties" and Loc.R. 35(C) of the Cuyahoga County Court of Common Pleas, Juvenile Division, provides:

> No case will be continued on the day of trial or hearing except for good cause shown, which cause was not known to the party or counsel prior to the date of trial or hearing, and provided that the party and/or counsel have used diligence to be ready for trial and have notified or made diligent efforts to notify the opposing party or counsel as soon as he/she became aware of the necessity to request a postponement. This rule may not be waived by consent of counsel.

{¶ 35} In regard to the denial of Father's request for a continuance on the first day of trial, the juvenile court noted that it had already granted Father continuances to allow him more time to form a relationship with B.D. This case was initiated in February 2020, and Father was identified as the "alleged father" at that time. Trial on CCDCFS's motion for permanent custody was originally scheduled for January 2022. Father appeared at that time — his first appearance in the case — and the court appointed an attorney for him; the trial was rescheduled for February 4, 2022. On February 1, Father's counsel filed a motion for a continuance so that Father could have more time to bond with B.D. and complete his case plan objectives. The trial court granted the continuance.

{¶ 36} On this record, the trial court did not abuse its discretion in denying Father a continuance on the first day of trial in May 2022. Father was aware of this proceeding since its inception in February 2020, and the court had previously allowed Father additional time to form a relationship with B.D. and complete his case plan objectives.

{¶ 37} The record demonstrates that the other interested parties — Mother's counsel, the Agency caseworker, the children's GAL, the intervention specialist, the foster mother, and CCDCFS's counsel — were present that day and ready to proceed. Continuing the trial at that time would have undoubtedly caused inconvenience to the other interested parties.

{¶ 38} Moreover, Father opted to wait almost two years to get involved in the case, despite being notified about it from the beginning. His desire to "take it slow" should not trump affording a permanent placement for B.D.

{¶ 39} The trial court did not abuse its discretion by denying Father's motion for a continuance on the first day of trial.

{¶ 40} Likewise, the trial court did not abuse its discretion by denying the motion for a continuance on the second day of trial. Father failed to appear, and counsel had no explanation for his nonappearance. Even now on appeal, Father has failed to explain his absence for the second day of trial. A parent facing termination of parental rights "must exhibit cooperation and must communicate with counsel and with the court in order to have standing to argue that due process was not followed in a termination proceeding." *In re Q.G.*, 170 Ohio App.3d 609, 2007-Ohio-1312, 868 N.E.2d 713, ¶ 12 (8th Dist.). Father failed to communicate with the court or his counsel regarding the circumstances of his absence. The trial court did not abuse its discretion in denying a continuance of the second day of trial.

{¶ 41} The trial court did not abuse its discretion in denying the request for a continuance on either the first or second day of trial. The first assignment of error is therefore overruled.

## Permanent Custody Determination Supported by Manifest Weight of the Evidence

{¶ 42} In his second assignment of error, Father contends that the trial court's termination of his parental rights was against the manifest weight of the evidence.

## Standard of Review and Permanent Custody Statute

{¶ 43} The juvenile court has exclusive jurisdiction to determine the custody of any child not a ward of another court of this state. R.C. 2151.23(A)(2). "It is well recognized that the right to raise a child is an 'essential' and 'basic' civil right." *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997), citing *In re Murray*, 52 Ohio St.3d 155, 556 N.E.2d 1169 (1990). Thus, "the overriding principle in custody cases between a parent and nonparent is that [biological] parents have a fundamental liberty interest in the care, custody, and management of their children." *In re Hockstok*, 98 Ohio St.3d 238, 2002-Ohio-7208, 781 N.E.2d 971, ¶ 16, citing *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). "This interest is protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and by Section 16, Article I of the Ohio Constitution." *In re Hockstok* at *id.*, citing *Santosky* at *id.*, and *In re Shaeffer Children*, 85 Ohio App.3d 683, 689-690, 621 N.E.2d 426 (3d Dist.1993). A parent's interest, however,

is "'always subject to the ultimate welfare of the child.'" *In re M.J.M.*, 8th Dist. Cuyahoga No. 94130, 2010-Ohio-1674, ¶ 15, quoting *In re B.L.*, 10th Dist. Franklin No. 04AP-1108, 2005-Ohio-1151, ¶ 7.

{¶ 44} A trial court's decision to grant permanent custody will not be reversed as being against the manifest weight of the evidence if the record contains competent, credible evidence by which the court could have found that the essential statutory elements for an award of permanent custody have been established by clear and convincing evidence. *In re B.P.*, 8th Dist. Cuyahoga Nos. 107732 and 107735, 2019-Ohio-2019, ¶ 22; *In re G.W.*, 8th Dist. Cuyahoga No. 107512, 2019-Ohio-1533, ¶ 62.

{¶ 45} "Clear and convincing evidence" is that "measure or degree of proof" that "produce[s] in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. "It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *Id.* at 477.

{¶ 46} R.C. 2151.414 sets forth a two-prong analysis to be applied by a juvenile court in adjudicating a motion for permanent custody. Under the statute, the juvenile court is authorized to grant permanent custody of a child to the agency if, after a hearing, the court determines, by clear and convincing evidence, that any of the five factors under R.C. 2151.414(B)(1)(a)-(e) exists and that permanent

custody is in the best interest of the child under the factors enumerated in R.C. 2151.414(D)(1).

**R.C. 2151.414(B)(1)**

{¶ 47} R.C. 2151.414(B)(1) governs the first step in an agency's motion for permanent custody and contains five factors. *In re R.H.*, 8th Dist. Cuyahoga No. 111505, 2022-Ohio-3765, ¶ 21. The trial court here made two of the findings. First, under R.C. 2151.414(B)(1)(a), the trial court found that B.D. "cannot be placed with either of [her] parents within a reasonable time or should not be placed with [her] parents."

{¶ 48} In determining whether a child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent, the juvenile court must consider "all relevant evidence," including specific factors enumerated in R.C. 2151.414(E). If the juvenile court finds by clear and convincing evidence that at least one of the enumerated factors in R.C. 2151.414(E) exists as to each of the child's parents, the juvenile court must find that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. R.C. 2151.414(E).

{¶ 49} Relative to Father, the juvenile court here made the following findings under R.C. 2151.414(E): (1) following the placement of B.D. outside of her home and notwithstanding reasonable case planning and diligent efforts by the agency to assist Father to remedy the problems that initially caused B.D. to be placed outside the home, Father has failed continuously and repeatedly to substantially remedy the

conditions causing her to be placed outside her home (R.C. 2151.414(E)(1)); (2) Father has demonstrated a lack of commitment toward B.D. by failing to regularly support, visit, or communicate with her when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for B.D. (R.C. 2151.414(E)(4)); (3) Father abandoned B.D. (R.C. 2151.414(E)(10)); (4) Father, for any reason, is unwilling to provide food, clothing, shelter, and other basic necessities for B.D. or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect (R.C. 2151.414(E)(14)); and (5) under the "any other relevant factor" provision in the statute, that "Father has a pending criminal case for felonious assault with firearm specifications, which allegedly occurred in December 2021." (R.C. 2151.414(E)(16)).

{¶ 50} Upon review, the juvenile court's findings are supported by competent, credible evidence. In regard to the court's failure to remedy finding, the record demonstrates that Father's case plan objectives were to establish a relationship with B.D., demonstrate an understanding of her behaviors, and secure appropriate housing to be able to safely accommodate her. The agency provided Father with notice of the proceedings since the case was initiated in February 2020. However, despite those notices, Father did not begin to engage with CCDCFS or have any contact with the child until nearly two years later in January 2022. According to the intervention specialist, caseworker, and foster mother, B.D.'s extreme behaviors started to escalate in late 2021 or early 2022, which was within the

timeframe that Father's paternity was established and he began having telephonic contact with the child.

{¶ 51}    At the time of the permanent custody trial in May 2022, Father had only visited with B.D. a total of three times. The record demonstrated that Father failed to make substantial progress in establishing a relationship with B.D.

{¶ 52}    The testimony at trial also established that Father did not make progress as it related to demonstrating an understanding of B.D.'s behavioral and mental health issues. At the time of trial, B.D. was nine years old, had significant behavioral and mental health issues, and had only had her first contact with Father a few months prior to the trial. Father knew, since at least February 2020, that he was potentially B.D.'s father, but failed to engage with her or CCDCFS. The caseworker testified that he did not have "much response" and appeared "confused" when she discussed B.D.'s behaviors and needs with him. Further, Father did not reach out to her to discuss B.D.'s behaviors and needs and was not consistent in learning about ways he could help her.

{¶ 53}    Moreover, the testimony presented at trial showed that Father had not successfully completed the housing objective of his case plan to be able to safely and appropriately accommodate the child in his home. He lived in a one-bedroom apartment with his two-year grandson. CCDCFS had concerns about that living arrangement given B.D.'s tendency to act aggressively toward younger children. The agency referred Father to a collaborative to assist him in finding suitable housing, but as of the time of trial, he was still residing in the one-bedroom apartment.

**Competent, credible evidence supports the juvenile court's failure to remedy finding**

{¶ 54} Competent, credible evidence also supports the juvenile court's lack of commitment finding. We recognize that Father did start having regular telephone contact with B.D. around January 2022, but at the time of trial, Father had only visited in person with B.D. a total of three times. He first became involved with B.D. in January 2022, which was nearly two years after the case was initiated. Further, the record is devoid of any evidence that Father provided support to B.D. by purchasing gifts, food, clothing, or other necessities for her. Father's delayed involvement with B.D. and the lack of consistent in-person visitation with the child support the trial court's lack of commitment finding.

{¶ 55} In regard to the court's abandonment finding, R.C. 2151.011(C) provides that "[f]or the purposes of this chapter, a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days." The juvenile court specifically noted that "[F]ather was named on the initial complaint in this case and did not begin visiting with the child until almost 2 years into the case." The trial testimony demonstrates that Father had no visitation or communication with B.D. from the time the case was filed in February 2020 until January 2022. The abandonment finding was therefore supported by competent, credible evidence.

{¶ 56}     The juvenile court's finding of a relevant factor as to why B.D. cannot or should not be placed with Father — a pending criminal case — is also supported by competent, credible evidence.  A copy of the pending indictment charging Father with felonious assault with firearm specifications was admitted into evidence.  This factor, along with the others mentioned above, provide competent, credible evidence for the juvenile court's finding that B.D. cannot or should not be placed with Father.

{¶ 57}     Based on its findings under R.C. 2151.414(E), the juvenile court was required to find that B.D. could not be placed with Father within a reasonable time or should not be placed with Father.  *See, e.g., In re C.H.*, 8th Dist. Cuyahoga Nos. 82258 and 82852, 2003-Ohio-6854, ¶ 58, citing *In re Glenn*, 139 Ohio App.3d 105, 113, 742 N.E.2d 1210 (8th Dist.2000) ("Once a court determines, by clear and convincing evidence one of the enumerated factors exists, the court must enter a finding that the child cannot or should not be placed with either of his parents within a reasonable time.").

{¶ 58}     In addition to finding under R.C. 2151.414(B)(1)(a) that B.D. cannot or should not be placed with Father, the juvenile court also made a finding under R.C. 2151.414(B)(1)(e).  That section provides that "[t]he child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state."  R.C. 2151.414(B)(1)(e).  The evidence at trial established that B.D. has been adjudicated on three prior occasions.

Thus, competent, credible evidence supports the juvenile court's finding under R.C. 2151.414(B)(1)(e).

{¶ 59} Having found that competent, credible evidence supports the juvenile court's findings under R.C. 2151.414(B), we now consider the second step of a permanent custody proceeding, that is, the best interest of the child determination.

**Best Interest Determination**

{¶ 60} R.C. 2151.414(D)(1)(a) through (e) set forth the relevant factors that a court should consider in determining the best interest of a child. "The court must consider all the elements in R.C. 2151.414(D) as well as other relevant factors. There is not one element that is given greater weight than the others pursuant to the statute." *In re Schaefer*, 111 Ohio St.3d 498, 2016-Ohio-5513, 857 N.E.2d 532, ¶ 56. This court reviews a trial court's best-interest determination under R.C. 2151.414(D) for an abuse of discretion. *In re R.H.*, 8th Dist. Cuyahoga No. 111505, 2022-Ohio-3765, at ¶ 27, citing *In re J.F.*, 2018-Ohio-96, 102 N.E.3d 1264, ¶ 55 (8th Dist.). "[T]he best interest determination focuses on the child, not the parent." *In re R.H.* at *id.*, citing *In re K.Z.*, 8th Dist. Cuyahoga No. 107269, 2019-Ohio-707, ¶ 85. While a trial court is required to consider each of the R.C. 2151.414(D)(1) factors in making its permanent custody determination, "there is not one element that is given more weight than the others pursuant to the statute." *In re Schaefer* at ¶ 56.

{¶ 61} In considering whether the grant of permanent custody was in B.D.'s best interest, the court considered the following R.C. 2151.414(D)(1) factors: "the interaction and interrelationship of the child with the child's parents, siblings,

relatives, and foster parents" (R.C. 2151.414(D)(1)(a)); "the wishes of the child" (R.C. 2151.414(D)(1)(b)); "the custodial history of the child, including whether the child has been in temporary custody of a public children services agency or private child placing agency under one or more separate orders of disposition for twelve or more months of a consecutive 22 month period" (R.C. 2151.414(D)(1)(c)); "the child's need for a legally secure permanent placement" and "whether that type of placement can be achieved without a grant of permanent custody" (R.C. 2151.414(D)(1)(d)); and "[w]hether any factors in divisions (E)(7) to (11) of this section apply in relation to the parents and the child (R.C. 2151.414(D)(1)(e)).

{¶ 62} Upon consideration of the above factors, the juvenile court made the following findings. Under R.C. 2151.414(D)(1)(a), the court found that B.D. "has only met and visited with the Father approximately 3 times. The child has been with the caregiver for over two years." Under R.C. 2151.414(D)(1)(c), the court found that B.D. "has been in agency custody for over two years on this case, which is the 4th time the child has been in agency custody."

{¶ 63} The court also found the following under R.C. 2151.414(D)(1)(d):

> The child deserves a safe and stable environment where all her needs can be met and she can thrive. This is the child's 4th time coming into agency custody. On a prior filing the child was placed in the legal custody of a relative. The Father was listed as an alleged father when this case was initiated in February 2020 and the father never engaged in services or met/established a relationship with the child until he established paternity, which wasn't until the end of 2021. While the father and the child have been visiting over the past few months since paternity was established they have only met approximately 3 times. Father does not fully understand the needs of the child. Father has a pending criminal case * * *.

May 31, 2022 permanent custody journal entry.

{¶ 64} A review of the record reveals clear and convincing evidence supporting the juvenile court's finding that permanent custody to the agency was in B.D.'s best interest and the juvenile court did not abuse its discretion in awarding permanent custody of her to CCDCFS.

{¶ 65} We recognize that B.D., at times, stated that she wished to live with Father. However, the foster mother testified that B.D. was inconsistent about who she wanted to live with and the inconsistency was based on "who she was mad at" at any particular time. "While [the wishes of the child are] one of the many factors under R.C. 2151.414(D), it is not controlling." *In re D.B.*, 2d Dist. Miami No. 2005-CA-33, 2006-Ohio-479, ¶ 42.

{¶ 66} We also recognize that the GAL recommended legal custody of B.D. to Father. The juvenile court was not bound by that recommendation, however. The juvenile court's focus in determining whether to terminate parental rights is the best interest of the child. R.C. 2151.414(B)(1) and (D). The juvenile court is assisted in making this determination by considering information presented by the GAL, including the GAL's report, recommendation, and other testimony. *See* Sup.R. 48.03(D)(11) (stating that a GAL's duties include providing the court "with any necessary information * * * to make an informed recommendation regarding the best interest of the child.").

{¶ 67} The GAL here admitted that although he had been assigned to the case in March 2020, his first contact with Father was a few weeks prior to the

May 2022 trial. He also admitted that Father's proposed living situation was not ideal and that Father's pending criminal case could pose an obstacle to Father working on his relationship with B.D.

{¶ 68} In reviewing permanent custody proceedings, we are mindful that the power of the trial court to exercise discretion is particularly important. The knowledge obtained through contact with and observation of the parties cannot always be adequately conveyed to a reviewing court through a printed record. *See Trickey v. Trickey*, 158 Ohio St. 9, 13, 106 N.E.2d 772 (1952). "The discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties." *In re Awkal*, 95 Ohio App.3d 309, 316, 642 N.E.2d 424 (8th Dist.1994).

{¶ 69} We find the trial court acted in its discretion, consistent with clear and convincing evidence in the record, in terminating Father's parental rights and committing B.D. to the permanent custody of CCDCFS. The trial court's decision was neither against the child's best interests nor the manifest weight of the evidence.

{¶ 70} The second assignment of error is therefore overruled.

{¶ 71} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHAEL JOHN RYAN, JUDGE

ANITA LASTER MAYS, A.J., and
MICHELLE J. SHEEHAN, J., CONCUR